## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ───────────────────────────────────── ) | |
| ALISON BUTTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 24-11499-MJJ |
| ) | |
| HARTFORD LIFE AND ACCIDENT ) | |
| INSURANCE COMPANY, and ) | |
| METROWEST JEWISH DAY SCHOOL ) | |
| DISABILITY PLAN ) | |
| ) | |
| Defendant. ) | |
| ───────────────────────────────────── ) | |

### MEMORANDUM OF DECISION

January 22, 2026

JOUN, D.J.

Plaintiff Alison Butter ("Ms. Butter") brings this action against Hartford Life and

Accident Insurance Company ("Hartford") and Metrowest Jewish Day School Disability Plan

(together, "Defendants") under the Employee Retirement Income Security Act ("ERISA"), 29

U.S.C. § 1001 *et seq*., alleging that Defendants improperly denied her long-term disability

benefits. The parties have each moved for Summary Judgment. [Doc. Nos. 36, 38]. For the

reasons below, both motions are DENIED.

## I.    FACTUAL BACKGROUND

### A.  The Policy

Metrowest Jewish Day School ("Metrowest") hired Ms. Butter as a Director of Student

Support or Student Success Coordinator. [Doc No. 31-2 at 944; Doc. No. 31-5 at 109].

Metrowest offers employees long term disability insurance coverage pursuant to a group policy (the "Policy") issued by Hartford. [Doc. No. 31-7 at 115]. The Policy provides long-term disability benefits ("LTD benefits") if claimants prove a continuing disability that lasts through the Policy's Elimination period and beyond. [*Id*. at 120; 129]. The Policy provides the following definition for "Disability or Disabled":

> Disability or Disabled means You are prevented from performing one or more of the Essential Duties of:
> (1) Your Occupation during the Elimination Period;
> (2) Your Occupation, for the 2 year(s) following the Elimination Period, and as a result Your Current Monthly earnings are less than 80% of Your Indexed Pre-disability Earnings; and
> (3) after that, Any Occupation.

[*Id*. at 129 (emphasis omitted)]. In other words, during the Elimination Period and the first 24 months following it, Disabled means "You are prevented from performing one or more of the Essential Duties of Your Occupation. [*Id*. at 125, 129]. After benefits are paid for 24 months, the definition of Disability changes to the "Any Occupation" standard. [*Id*. at 129].

"Specifically, "Your Occupation" means the claimant's occupation "as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location." [*Id*. at 132]. An "Essential Duty" is a duty that "1) is substantial, not incidental; 2) is fundamental or inherent to the occupation; and 3) cannot be reasonably omitted or changed." [*Id.*]. A claimant's ability to work the number of hours in her regularly scheduled workweek is an Essential Duty, but it is not an Essential Duty to work more than 45 hours a week. [*Id.*].

The Policy also contains the following stipulation as to Hartford's discretion: "We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy. This provision applies where the interpretation of The Policy

2

is governed by the Employee Retirement Income Security Act of 1974, as amended (ERISA)." [*Id.* at 128].

### B. Initial Claim For Benefits

Ms. Butter stopped working on March 26, 2021. [Doc. No. 31-2 at 944; Doc. No. 31-5 at 152]. She submitted a claim for disability benefits stating she suffered from "leg pain, neck pain, overall body pain, and fatigue." [Doc. No. 31-5 at 152]. Ms. Butter described her occupational duties as "creat[ing] support schedules for staff and students, public school liaison, mentor services, work with parents etc…" [*Id*. at 151]. In addition to her claim form, Ms. Butter submitted an Attending Physician Statement dated September 16, 2021, from Dr. Susan R. Gordon, her primary care physician. [*Id*. at 159–161]. Dr. Gordon listed a confirmed diagnosis of "mild bilateral osteoarth[r]itis, complex ovarian cyst" and a description of symptoms of "bilateral leg paresthesia/pain, cervical radiculopathy, fibromyalgia, chronic pelvic congestion and pelvic pain, Raynaud's anemia of chronic dse." [*Id*. at 159, 161]. Dr. Gordon also determined that Ms. Butter was unable to work and completely unable to sit, stand, or walk during a typical day. [*Id*. at 161]. Finally, Dr. Gordon was "unable to determine" the expected duration of Ms. Butter's restrictions or limitations but noted that Mr. Butter was looking for permanent disability. [*Id*.].

Ms. Butter also spoke with Hartford Senior Ability Analyst Susan H. Peterson and told her that she was only able to hold her head up for 18 to 20 minutes at a time before having severe pain. [Doc. No. 31-2 at 527]. According to Ms. Peterson's report, Ms. Butter believed the neck surgery she had made things worse, Ms. Butter was recovering from surgery for an ovarian cyst, and Ms. Butter stopped working because it was getting too much for her body. [*Id*.]. On October 4, 2021, Hartford informed Ms. Butter that Hartford had approved her claim for long term

disability benefits. [Doc. No. 31-2 at 557]. Such benefits became payable effective June 24, 2021, after conclusion of the 90-day Elimination Period. [*Id*.].

### C. Medical Treatment

#### 1. 2021

On November 8, 2021, Dr. Gordon documented that Ms. Butter's mood was adversely affected by chronic pain but she was not depressed, that Ms. Butter continued to have severe neck pain, felt pain and numbness in her left leg more than her right leg, and that her weight loss appeared to have stabilized. [Doc. No. 31-3 at 19–20]. On November 28, 2021, Ms. Butter was involved in a motor vehicle accident, where she was rear-ended, resulting in increased pain in the neck and shoulder region and the lower back and buttock. [Doc. No. 31-4 at 53–54]. There were no reported fractures from CAT scans, but Ms. Butter reported ongoing pain. [*Id*. at 54].

On December 13, 2021, Ms. Butter was seen by Dr. Robert Friday who documented that Ms. Butter's left leg pain was getting worse and her right foot was slowly worsening. [Doc. No. 31-4 at 226]. On December 29, 2021, Dr. Omar H. El Abd evaluated Ms. Butter and determined she had bilateral C7 radicular pain, cervical facets arthropathy, and deconditioning. [Doc. No. 31-4 at 201]. Dr. Abd determined that if an MRI test was positive and the pain persisted, Ms. Butter should undergo therapeutic left C7 spinal nerve root block injections. [*Id*. at 202].

#### 2. 2022

Ms. Butter continued to see Dr. Abd roughly monthly in early 2022. *See* [Doc. No. 31-4 at 203–222]. In a January 2022 visit, Dr. Abd documented that Ms. Butter reported persistent pain, that Ms. Butter uses a cane and that heal, toe, and tandem walking was possible with assistance. [*Id*. at 203, 205]. Dr. Abd determined that for further management, Ms. Butter would undergo left C6-7 injections. [*Id*. at 206]. Ms. Butter was given two injections in February 2022 and on March 16, 2022, Physician Assistant Tracey J. Crossman reported "Right C6-7 facet joint

intra-articular injection on 2/1/2022 with 70% temporary improvement of her symptoms X 3 weeks." [*Id*. at 213]. The physical examination included notes about reduced bilateral neck rotation, pain on lateral bending, axial compression and neck rotation positive bilaterally. [*Id*. at 215]. Finally, the report stated that "[f]or further management, the patient will undergo Therapeutic Right C6-7 facet joint injections…" [*Id*. at 216].

On April 5, 2022, Ms. Butter saw Dr. Zacharia Isaac for an evaluation. [Doc. No. 31-3 at 1]. Dr. Isaac noted that Ms. Butter had some injections with his colleague, Dr. Abd, with some improvement and found no electrophysiologic evidence of peroneal neuropathy or L4-S1 radiculopathy on the left side. [*Id*. at 1, 6]. He noted multifactorial chronic pain, underlying fibromyalgia, neck pain related to adjacent segment degeneration at C3-4, low back pain related to mild lumbar degenerative changes etc... [*Id*. at 12]. Dr. Isaac also noted normal toe and heel walking but decreased balance bilaterally and short step length, hamstring tightness, and neck discomfort with all planes range of motion although cervical range of motion was full. [*Id*. at 5–6]. Finally, Dr. Isaac prescribed no new medication and did not recommend any specific injections but noted Ms. Butter could continue to follow with Dr. Abd. [*Id*. at 12].

On April 7, 2022, Ms. Butter received a diagnostic right C6-7 facet joint intra-articular injection. [Doc. No. 31-4 at 185]. According to PA Crossman's notes, Ms. Butter reported persistent pain and minimal improvement of symptoms from the right C6-7 and the left C6-7 facet joint intra-articular injections on 2/24/2022 and 4/7/2022. [*Id*. at 186].

Between April and September 2022, Ms. Butter attended several physical therapy sessions that documented Ms. Butter's consistent pain but also indicated that Ms. Butter had taken two international trips, had cleaned out her garage and lifted and moved boxes, and was not using the cane for a period of time. [Doc. No. 31-4 at 141–182].

On May 11, 2022, Ms. Butter saw Dr. Gordon for a follow-up and to fill out disability paperwork. [Doc. No. 31-2 at 1229–1232]. Dr. Gordon indicated that Ms. Butter's mood was adversely affected by her chronic pain, but she was not depressed, that she continued to have severe neck pain, has pain and numbness in her legs left greater than right, and that she lost 20 pounds but has stabilized over the past several months. [*Id*. at 1231]. Dr. Gordon further documented that Ms. Butter walks for exercise but was unable to walk for more than 20 minutes because of pain and that Ms. Butter was alert, oriented, and with appropriate affect. [*Id*.]. Dr. Gordon completed an Attending Physician Statement, which stated that Ms. Butter could not sit, stand, or walk, even intermittently, for any length of time during a typical workday. [Doc. No. 31-4 at 336]. Dr. Gordon described the expected duration of such limitations or restrictions as "indefinite." [*Id*.].

On May 24, 2022, Ms. Butter received right C2-3 and C3-4 facet joint intra-articular injections. [Doc. No. 31-4 at 191]. The report indicated "decreased occurrence of headaches" but that Ms. Butter reported persistent pain in the bilateral suprascapular areas. [*Id*. at 192]. She was referred to Dr. Darren Rosenberg due to persistent suprascapular pain. [Doc. No. 31-4 at 221, 433].

On June 1, 2022, Ms. Butter visited Dr. Friday, who conducted a physical exam and noted her ongoing pain. [Doc. No. 31-4 at 231–234]. On June 8, 2022, Ms. Butter received a diagnostic right C2-3 and C3-4 facet joint intra-articular injections. [Doc. No. 31-4 at 191].

On June 20, 2022, Ms. Butter saw Dr. Kenneth D. Polivy, who, upon physical examination, documented that Ms. Butter was well nourished and well developed, stood with level hips and shoulders, was awake and oriented, with full coordination and balance. [*Id*. at 76]. Dr. Polivy also documented that Ms. Butter's gait was nonantalgic though extension of the back

was painful, and that Ms. Butter was ambulating with a cane but also able to do better without the cane and in the office. [*Id*.].

On August 22, 2022, Ms. Butter again saw Dr. Polivy who repeated his assessment from the June 20, 2022, visit. [*Id*. at 78]. Dr. Polivy additionally noted that an MRI scan revealed mild degenerative changes in the lumbar spine and some numbness and tingling around the hip that radiated to the groin. [*Id*.].

On October 3, 2022, Dr. Polivy noted that Ms. Butter was seen for lumbar back and left hip complaints. [Doc. No. 31-4 at 64]. Ms. Butter reported feeling improvement with the physical therapy, continued but improving headaches, and that she believed that she was improving with response to her left hip complaints and radiating pain down the left leg. [*Id*.]. He repeated his assessment from previous visits but noted that the extension of back was good. [*Id*.].

On November 16, 2022, after complaints of intermittent flank pain and sleeplessness, Dr. Gordon prescribed a small amount of oxycodone to relieve Ms. Butter's pain. [Doc. No. 31-2 at 1198]. Dr. Gordon noted that Ms. Butter was unable to stand or sit for more than 15 minutes at a time. [*Id*.].

On December 5, 2022, Dr. Friday stated in a report that Ms. Butter had no obvious discomfort, but had weakness in her left leg, was unable to move her toes at all, mild tenderness of all soft tissue tender points, and that she was alert and cooperative. [Doc. No. 31-3 at 660]. Ms. Butter reported neck pain and that she feels like something is broken in her left hip region, and heaviness in her left leg. [*Id*. at 659].

### 3. **2023**

On February 7, 2023, Ms. Butter visited Brigham and Women's Hospital for a neuropsychological evaluation. [Doc. No. 31-3 at 274]. A report stated that Ms. Butter

demonstrated intact cognitive functioning across all cognitive domains evaluated, despite the significant pain she experienced throughout the evaluation. [*Id*. at 278]. The report noted her subjective experience of cognitive decline is likely explained by a combination of factors such as her chronic pain, very poor sleep, and persistent fatigue. [*Id*. at 279].

D. **SSDI, Hartford's Surveillance of Ms. Butter, the Independent Medical Examination, and the Termination of Benefits**

On April 26, 2022, Ms. Butter was approved for SSDI benefits. [Doc. No. 31-2 at 509].

In June 2022, Hartford placed Ms. Butter on surveillance. [Doc. No. 37 at 9; Doc. No. 31-4 at 11]. She was observed on June 17, 2022, with the investigator noting that Ms. Butter was driving, carrying various items, ascending stairs, and entering her home. [Doc. No. 37 at 9]. From a separate observation in July, the investigator noted that Ms. Butter "bent at the waist," "lifted a lawn chair," and "retrieved a second chair." [*Id.* at 10].

On September 27, 2022, Hartford notified Ms. Butter that she would need to prove her disability from "any occupation" from June 24, 2023, onwards. [Doc. 31-2 at 626-27]. On September 13, 2022, Hartford representative Amy Labrecque interviewed Ms. Butter telephonically. [Doc. No. 31-4 at 241]. During that call, Ms. Butter stated that her role entailed walking, standing, sitting, kneeling, bending, lifting – a combination of different movements, and that her pain makes it hard to walk up and down stairs, to bend over, to lift things. [*Id*. at 242–243]. Ms. Butter also stated that she uses a cane and that with physical therapy she has been able to reduce using a cane, and that she can walk for fifteen minutes at a time and do everyday activities like grocery shopping with a carriage to lean on. [*Id*. at 249–251].

On December 30, 2022, Registered Nurse Wendy McCue, Hartford's Medical Case Manager, sent copies of the investigation reports Hartford had obtained to each of Ms. Butter's treating physicians. [Doc. No. 31-2 at 634–641]. Dr. Gordon responded that Ms. Butter was

unable to work because of lower extremity dyskinesia, foot pain, difficulty ambulating, and memory impairment. [Doc. No. 31-3 at 650]. Dr. Friday also opined that Ms. Butter would not be able to work because of foot drop and sensory disturbance, chronic pain, likely CRPS of the left leg, and long lasting fibromyalgia. [Doc. No. 31-3 at 654]. Neither Dr. Polivy nor Dr. Isaac responded to Hartford's inquiries. [Doc. No. 31-2 at 646–647].

On December 16, 2022, Hartford asked Ms. Butter to submit to an Independent Medical Examination ("IME"). [Doc. No. 31-2 at 486]. On March 14, 2023, Ms. Butter submitted to an IME by Dr. Adrianna Carrillo, who was selected by a third-party vendor. [*Id*.]. Dr. Carrillo concluded, based on the existing record and her interview of Ms. Butter, that she "would be able to sit up to 8 hours per day with the ability to change position as needed for comfort, walking for up to 60 minutes at a time to 8 hours total per day, and stand for up to 60 minutes at a time up to 5 hours total per day," with "[o]ccasional bending, squatting [and] kneeling." [Doc. No. 31-3 at 600]. Upon Dr. Carillo's report, Nurse McCue sent copies to Drs. Gordon, Friday, Polivy, and Isaac and asked whether they agreed with the findings; they did not respond. [Doc. No. 31-2 at 649–659].

On March 29, 2023, Hartford determined that Ms. Butter did not meet the Policy's definition of disability and terminated her benefits. [Doc. No. 31-2 at 660–68]. Its decision letter recited Hartford's findings of Ms. Butter's medical, personal, and occupational backgrounds. [*Id*.]. The letter adopted Dr. Carrillo's findings of her functional capabilities in their entirety and stated that Hartford's "employability analysis" found seven occupations for which Ms. Butter was qualified and that were within her physical capabilities. [*Id.* at 666]. On this basis, Hartford determined that Ms. Butter did not meet the "Any Occupation" standard set forth in the Policy. [*Id*.]. Hartford also determined that Ms. Butter did not meet the "Your Occupation" policy

definition of Disability upon a determination that Ms. Butter could perform her duties as Director/Education Program/Counselor. [*Id.*].

### E.  Administrative Appeal

On September 18, 2023, Ms. Butter appealed Hartford's decision through her attorney. [Doc. No. 31-3 at 178]. The appeal enclosed an IME report from Dr. Walter Panis conducted in July 2023, a Functional Capacity Evaluation ("FCE") by Ms. Kerry Raymond conducted in May 2023, as well as Ms. Butter's hospital records from 2021 to 2023, among other new information. [Doc. No. 31-2 at 681].

In his report, Dr. Panis indicated that he conducted a physical examination of Ms. Butter as well as reviewed her medical records. [Doc. No. 31-3 at 183-188]. Dr. Panis diagnosed Ms. Butter with "chronic pain syndrome," and offered his opinion to a reasonable degree of medical certainty that Ms. Butter was "unable to perform at least a sedentary level of work," and that she was "unable to perform at least one essential duties of her own or any occupation on a part-time or full-time basis." [*Id.* at 188-89].

The FCE conducted by Ms. Raymond assessed Ms. Butter with "[c]linical testing [for] range of motion, strength, and sensation." [Doc. No. 31-3 at 245]. Specifically, her report corroborated Ms. Butter's report of "postural limitations in standing, walking, and sitting," and found Ms. Butter to have "difficulty tolerating" some of the tests administered. Ms. Raymond found that Ms. Butter "demonstrated a high level of consistency during the evaluation," and that the testing administered showed consistency with her subjective reports of symptoms. [*Id.*]. Ms. Raymond accordingly concluded that "Ms. Butter not return to work at this time, even at a Sedentary Physical Capacity," finding that her "current functional capacity does not meet the necessary capabilities with full- or part-time work." [*Id.*].

Hartford also received a letter from Dr. Abd and affidavits from Alan Klevan and Alison Butter. [Doc. No. 31-2 at 685–686]. In his January 22, 2024 letter, Dr. Abd stated that despite lumbar spine interventions, Ms. Butter continues to have chronic cervical and lumbar spinal pain, which will more likely than not continue to be a permanent condition with intermittent exacerbations. [Doc. No. 31-2 at 1071]. Dr. Abd opined that Ms. Butter's pain more likely than not will continue to restrict her daily and physical activities permanently, and she will continue to have limitations such as prolonged sitting on a computer, kneeling, and driving. [*Id.*]. Dr. Abd stated that Ms. Butter is permanently disabled from performing her own or any occupation due to her conditions. [*Id.* at 1072].

On the other hand, Hartford obtained, upon referral by a third-party vendor, the opinions of two physicians upon their respective reviews of the medical record. Dr. Annie Layno-Moses opined that Ms. Butter was "physically impaired" while stating that there seemed to be inconsistencies between her "reported impairments" and daily activities seen under surveillance. [Doc. No. 31-2 at 1105]. Ultimately, Dr. Layno-Moses concluded that Ms. Butter's "abilities are sustainable on a full-time basis," subject to a list of recommended restrictions and limitations. [*Id.*].

On this basis, Hartford found that "the medical information in the claim file does not support that Ms. Butter is totally disabled from performing any occupation from 6/24/23 forward," and accordingly upheld the termination of her benefits. [Doc. No. 31-2 at 697].

## II.    LEGAL STANDARD

Where "the administrator of an ERISA plan is imbued with discretion in the interpretation and application of plan provisions, its use of that discretion must be accorded deference." *Bernitz v. Usable Life*, 149 F.4th 113, 120 (1st Cir. 2025) (quoting *Dutkewych v.*

*Standard Ins. Co.*, 781 F.3d 623, 633 (1st Cir. 2015)). The reviewing court upholds the decision

of the plan administrator unless the decision was "arbitrary, capricious, or an abuse of

discretion," a standard that turns on whether the eligibility determination is "reasoned and

supported by substantial evidence." *Dutkewych*, 781 F.3d at 633. There are several pieces to this

analysis.

## A.  Regarding Plaintiff's Claim Of Structural Conflict

A court must consider "several different, often case-specific factors, reaching a result by

weighing it all together." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). Important

among the factors is structural conflict, which arises if a plan administrator assumes the "dual

role of both evaluating and paying benefit claims." *Bernitz*, 149 F.4th at 121 (citing *Glenn*, 554

U.S. at 116–17). The First Circuit affords "little weight" to structural conflicts if the insurer takes

"sufficient steps to insulate its claims determination process." *Bernitz*, 149 F.4th at 122 (quoting

*Denmark v. Liberty Life Assur. Co.*, 566 F.3d 1, 9 (1st Cir. 2009)). Relevant factors in assessing

whether the insurer has taken sufficient steps to mitigate the pernicious effects of a structural

conflict include good-faith payments during the pendency of the administrative appeal,

employing third-party vendors to select independent physicians to analyze medical records, and

using a separate appeals unit to review the initial denial. *Bernitz*, 149 F.4th at 122.

## B.  Regarding Plaintiff's Claim That Hartford Failed To Engage With Policy Terms

An abuse-of-discretion inquiry considers "the text of the ERISA plan and the plain

meaning of the words used therein, which cabin the plan's administrator's discretion." *Santana-*

*Diaz v. Metro. Life Ins. Co.*, 919 F.3d 691, 695 (1st Cir. 2019). The administrator's fiduciary

duty was to "see that the plan is 'maintained pursuant to [that] written instrument.'" *Bernitz*, 149

F.4th at 124 (quoting *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 108 (2013)).

Courts "need not decide the 'best reading' of the plan. . . . [courts] need only consider whether the administrator's interpretation of the [Policy] and its application of the [Policy] terms to the facts of this case was 'reasoned and supported by substantial evidence.'" *Bernitz*, 149 F.4th at 124 (quoting, *inter alia*, *O'Shea v. UPS Ret. Plan*, 837 F.3d 67, 73 (1st Cir. 2016)) (alterations omitted).

## III.   ANALYSIS

### A.   <u>Structural Conflict</u>

Ms. Butter argues that Hartford's structural conflict of interest, where Hartford was both the adjudicator and payer of claims, tainted its review. Hartford argues that the structural conflict of interest is not entitled to any weight. I agree with Hartford. Here, Hartford "employed third-party vendors to select independent physicians to analyze [Ms. Butter's] medical records." *Bernitz*, 149 F.4th at 122. Upon Ms. Butter's appeal, she was provided with a different appeal specialist to review the initial denial. Furthermore, "the record does not reflect that [Hartford] has a history of biased claims administration, or that [Hartford] provided blatantly inconsistent reasons for termination, or denied [Ms. Butter] a reasonable opportunity to respond to [Hartford's] explanations as to why it deemed [her] no longer disabled under the [Policy]." *Id.* at 123 (cleaned up). Accordingly, I afford little weight to the structural conflict.

### B.   <u>Hartford's Motion For Summary Judgment</u>

Hartford argues that Ms. Butter's functional capacity was far in excess of the limits and restrictions she claimed given its independent medical examiner assessments and inconsistencies in Ms. Butter's doctor evaluations and personal advocates. In letters, dated March 29, 2023, and March 21, 2024, Hartford outlined the information it relied upon to deny Ms. Butter's claim and subsequent appeal:

- Video Surveillance conducted on 6/17/2022; 6/18/2022; 7/1/2022; 7/21/2022; 7/22/2022
- Ms. Butter's interview with Harford Representative, Amy Labrecque
- Examination by Dr. Adriana Carillo
- Independent medical opinion dated 1/23/24 from Dr. Annie Layno-Moses, Board Certified Physical Medicine & Rehabilitation/Pain Medicin with ECN/Genex
- Review by Dr. Rujvi Kamat, Board Certified Psychology/Neuropsychology
- Vocational Rehabilitation Clinical Case Manager

[Doc. No. 31-2 at 660–668, 681–689]. Hartford also indicated that the information contained in Ms. Butter's case file and new information submitted was reviewed. [*Id.* at 662]. Ms. Butter's case file included attending physician statements from Dr. Susan Gordon, Dr. Eric Carkner and medical records from Dr. Gordon, Dr. Robert Friday, Dr. Zacharia Isaac, Dr. Robert Yong, Dr. Christopher Paul Chiodo, Dr. Carolyn Cline, Dr. Omar Abd, Dr. Tracey Cossman, Dr. Kenneth Policy, Dr. Robert Kenney, Dr. Jamie Grill, Dr. Eric Carkner, and more. [*Id.* at 662–663, 681–682].

### 1.  <u>The March 2023 Report</u>

I start with the surveillance videos, which seemed to trigger Hartford's belief that there were discrepancies in Ms. Butter's reported limitations. The surveillance videos as evaluated, were given undue weight. Of the five surveillance videos, two videos do not include Ms. Butter in the footage. Significantly, the three that include Ms. Butter span at most two and a half minutes, of which Ms. Butter is depicted for at most a minute at a time. Defendants are technically true in their characterizations of Ms. Butter's actions; for example, she is seen carrying a grocery bag, cane and a water bottle on June 17, 2022; however, the assessment fails to consider her slow gait, the obvious struggle in her movements, and the short length of observation. "[I]f the administrator has placed undue and improper weight on certain types or

pieces of evidence, the resulting determination may be arbitrary and capricious." *Al-Abbas v. Metro. Life Ins. Co.*, 52 F. Supp. 3d 288, 297 (D. Mass. 2014).

I move to Ms. Butter's examination. After an interview a Hartford representative, where Ms. Butter stated that she experienced chronic pain which prevented her from walking and standing for more than 15 to 30 minutes at a time, Ms. Butter was examined by Dr. Adriana Carillo on February 24, 2023. [Doc. No. 31-2 at 664–665]. According to the March 29, 2023 report, Dr. Carillo in one examination, and upon review of medical records and the video surveillance, determined that Ms. Butter could sit for up to 8 hours a day, walk for up to 60 minutes at a time to 8 hours per day, stand for up to 60 minutes at a time up to 5 hours per day, and ultimately work 8 hours a day, 5 days a week. [*Id.* at 665]. Dr. Carillo's evaluation contradicts Ms. Butter's treating physicians' assessment of her functional capabilities. Dr. Friday and Dr. Gordon both stated that Ms. Butter was incapable of full-time functioning. [*Id.*]. They describe Ms. Butter's chronic pain, longstanding fibromyalgia, lower extremity dyskinesia, foot pain. [*Id.*]. Significantly, the March 29, 2023 report provides no explanation as to why Dr. Gordon and Dr. Friday's assessments are not entitled to any weight. While the "mere existence of contrary evidence in the record is not sufficient to render a determination arbitrary and capricious," "a plan administrator may not simply ignore contrary evidence, or engage with only that evidence that supports his conclusion," as here. *See Al-Abbas*, 52 F. Supp. 3d at 295.

In addition to giving undue weight to the surveillance footage and Dr. Carillo's one evaluation, Hartford's decision to deny benefits is also inadequate because it improperly rejected much of the evidence that Ms. Butter submitted. The March 29, 2023, report does not grapple at all with the years of documentation about Ms. Butter's chronic pain, including neck pain and leg pain, her car accident, and consistent injection treatment from 2021 to 2023.

2.  **The March 2024 Report**

Ms. Butter subsequently appealed the denial of benefits. In response, Hartford, in a new report dated March 21, 2024, stated that Ms. Butter's claim file was forwarded to its vendor to coordinate an independent medical records review of the all the medical information submitted. [Doc. No. 31-2 at 683]. As a result of this medical review, on January 23, 2024, Dr. Annie Layno-Moses determined that Ms. Butter had certain restrictions and limitations from March 29, 2023 onward, including sitting up to 30 minutes at a time, for up to 6 hours per day, standing up to 30 minutes at a time, for up to 2 hours per day, with assistive devices, walking up to 30 minutes at a time, for up to 2 hours per day, with assistive devices, and more. [*Id.*]. Dr. Layno-Moses stated that Ms. Butter "has a complex medical history involving bilateral leg paresthesia/pain, cervical radiculopathy, fibromyalgia, chronic pelvic pain, and degenerative disc disease involving her cervical and lumbar spine" and that Ms. Butter's abilities were sustainable on a full-time basis. [*Id.*]. While Dr. Layno-Moses seems to grapple more with the medical evidence submitted by Ms. Butter, she fails to explain why Ms. Butter would be capable of full-time functioning, in contradiction to Dr. Friday and Dr. Gordon's assessments. Dr. Layno-Moses seems to unduly rely on the surveillance footage, presumably the same as from the March 2023 report, when questioning the severity of Ms. Butter's reported impairments. [*Id.*].[1]

Upon receipt of Ms. Layno-Moses's assessment, Ms. Butter submitted a report from Dr. Omar El Abd on January 22, 2024, affidavits, a letter from Dr. Walter Panis on March 18, 2024, and information of her award of Social Security Disability Insurance benefits ("SSDI"). Dr. Layno-Moses rejected Dr. Abd's recommendation that Ms. Butter could not work because "there

---

[1] In another assessment, Dr. Rujvi Kamat, Board Certified in Psychology/Neuropsychology, found that "the medical information restrictions and limitations" were not supported as of 3/29/2023 onwards from a cognitive standpoint.

is no documentation of clinical findings to suggest total inability of activity, such as functional loss of strength/sensation and mobility/gait." [*Id.* at 685]. This misses the point. Ms. Butter's diagnosis is also based on subjective complaints of pain. That she is not totally unable to do any activity or does not have functional loss of strength does not address Dr. Abd's assessment of Ms. Butter's chronic pain. Hartford also does not sufficiently address Dr. Walter Panis's letter; Hartford merely acknowledges the letter and indicates that it was relying on Dr. Layno-Moses's assessment of Ms. Butter's restrictions and limitations.

Finally, Hartford argues that it considered the Social Security Administration's award of disability benefits and adequately explained its own decision. I disagree. After Ms. Butter notified Hartford that she was awarded SSDI, Hartford provided a vague explanation for why an award of SSDI did not entitle her to long-term disability benefits. Rather than point to any specifics, Hartford stated "medical evidence in the SSA's possession and The Hartford's possession *may* be different. The decision *may* be made with overlapping, but distinct, sets of medical evidence. In addition to medical evidence, The Hartford's decision *may* also be based on vocational and behavioral evidence, which the SSA is not required to use in the same way." [*Id.* at 687 (emphasis added)]. Hartford does not sufficiently explain that the actual medical evidence it relied upon was different than that which was in the SSA's possession, how it was different, and how it relied on vocational and behavioral evidence that differed from the SSA. For all these reasons, Hartford's Motion for Summary Judgment is <u>DENIED</u>.

### C.  <u>Ms. Butter's Motion For Summary Judgment</u>

Ms. Butter also moves for summary judgment arguing that Hartford's termination of her benefits fails to meaningfully engage with her submitted evidence and was not reasoned and

supported by substantial evidence. She contends that the ERISA record reflects a well-documented and consistent history of disabling physical impairments.

While I am inclined to rule in Ms. Butter's favor, "it would be unwise to take this step without first giving [Hartford] the chance to address the deficiencies in its approach. The record demonstrates that [Ms. Butter] did not get the kind of review to which she was entitled under applicable law." *Hardt v. Reliance Standard Life Ins. Co.*, 07-cv-00105 at 18 (E.D. Va. March 31, 2008). Where the plan administrator has failed to comply with the ERISA guidelines, remand for further review is appropriate. *See Al-Abbas*, 52 F. Supp. 3d at 298.

## IV.    CONCLUSION

For the aforementioned reasons, Hartford's Motion for Summary Judgment, [Doc. No. 36], is <u>DENIED</u>. Ms. Butter's Motion for Summary Judgment, [Doc. No. 38], is similarly <u>DENIED</u>. The case is remanded to the plan administrator for further review in accordance with this decision.

SO ORDERED.

/s/ Myong J. Joun
United States District Judge